**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | : | |
| SISTER KARRIEMAH H. MUQEET, | : | Case No. 24-cv-00822 (DG)(TAM) |
| | : | |
| Plaintiff, | : | |
| | : | |
| -against- | : | |
| | : | **Filed Electronically** |
| HOME DEPOT U.S.A., INC., and | : | |
| ANTHONY GUMBS, | : | |
| | : | |
| Defendants. | : | |
| | : | |

---

**DEFENDANT HOME DEPOT U.S.A., INC.'S**
**STATEMENT OF UNDISPUTED MATERIAL FACTS**

---

**EPSTEIN BECKER & GREEN, P.C.**
875 Third Avenue
New York, New York  10022
(212) 351-4500

One Gateway Center
Newark, New Jersey  07102
Phone: (973) 642-1900

**Attorneys for Defendant**
Home Depot U.S.A., Inc.

FIRM:70629422v1

# TABLE OF CONTENTS

**Page**

I.   Home Depot Policies Pertinent To This Motion ........................................................... 1
    a.  Home Depot's Standards of Performance ........................................................ 1
    b.  Home Depot's Harassment and Non-Discrimination Policy ........................... 3
    c.  Home Depot's Reasonable Accommodation Policy ........................................ 4
    d.  Home Depot's Leave of Absence Policy ........................................................ 4
    e.  Home Depot's COVID-19 Category 3b Leave of Absence ............................. 6

II.  Plaintiff's Employment With Home Depot .................................................................. 7

III. The Freight Associate Position ................................................................................... 8

IV.  Plaintiff's Interaction with Co-Worker Anthony Gumbs ........................................... 10
    a.  Late 2019 ....................................................................................................... 10
    b.  Winter 2019 ................................................................................................... 11
    c.  Winter 2019/2020 ......................................................................................... 11
    d.  A "Couple Months Later" In Early 2020 ...................................................... 12
    e.  April 24, 2020 ............................................................................................... 13
    f.  Several Months Later In Summer 2020 ......................................................... 15
    g.  July 1, 2020 ................................................................................................... 16

V.   Home Depot's Response ............................................................................................ 17

VI.  Plaintiff's Complaint About Music Played During The Overnight Shift .................... 21

VII. Plaintiff's COVID Related Cat3b Leave of Absence .................................................. 25
    a.  Plaintiff Puts Herself Out On A COVID-Related Category 3b LOA .............. 25
    b.  Home Depot Grants Plaintiff's Request For A Medical Leave Upon The Expiration Of Her Category 3B Leave ........................................................... 26
    c.  Plaintiff's Inability To Return To Work By December 31, 2022, And The Circumstances Leading To The Termination Of Plaintiff's Employment ....... 27

FIRM:70629422v1

Pursuant to Local Rule 56.1 of the United States District Court for the Eastern District of New York, Defendant Home Depot U.S.A., Inc. (referred to herein as "Home Depot"), by and through its undersigned counsel, submits the following Statement of Undisputed Material Facts in support of its Motion for Summary Judgment.[1]

## I. Home Depot Policies Pertinent To This Motion

1. When plaintiff was hired by Home Depot on or about January 6, 2017, she participated in Home Depot's new hire orientation and was trained on various Home Depot policies including, without limitation, Home Depot's Respect Policy. *See* Deposition of Karriemah Muqeet dated April 29, 2025 and May 30, 2025 ("Plaintiff Dep.") at p. 119, l. 7 – p. 120, l. 5, p. 120, l. 11-20 and p. 121, l. 21- p. 122, l. 4, attached to the Declaration of Patrick G. Brady dated June 22, 2026 ("Brady Decl.") as Exhibit 1.[2]

2. Plaintiff admittedly received "a lot" of Home Depot policy and procedure documents during her New Hire Orientation. *Id*. at p. 122, l. 11-17.

3. In addition, plaintiff received continuous on-going training throughout her employment with Home Depot, including repeated training on Home Depot's Harassment and Non-Discrimination Policy. *Id*. at p. 120, l. 21 – p. 121, l. 11 and p. 124, l. 21 – 125, l. 18.

### a. Home Depot's Standards of Performance

4. One of the policies and procedures on which plaintiff was trained was Home Depot's Standards of Performance. *Id*. at p. 125, l. 11-13.

---

[1] As plaintiff Karriemah Muqeet ("plaintiff") never served individual defendant Anthony Gumbs with the Summons and Complaint, this Motion for Summary Judgment is limited to the claims asserted by plaintiff against Home Depot.

[2] The exhibits referenced herein will be filed with the finalized Statement of Facts in accordance with the schedule to be set by the Court. Copies of the exhibits will be provided prior to the filing of the finalized Statement of Facts if requested by the Court.

FIRM:70629422v1

5. Home Depot's Standards of Performance is "a policy and progressive disciplinary process that establishes expectations for workplace conduct/behavior and overall job performance, and outlines consequences when those expectations are not met." *See* Home Depot's May 2017 Standards of Performance, at p. 1, attached to the Brady Decl. as Exhibit 2.

6. As explained in the Standards of Performance, one of Home Depot's core values is "Respect for All People." *Id*. at p. 4.

7. Home Depot's Respect Policy provides that:

> The Company is committed to providing an environment of mutual respect, free from harassment and discrimination for our associates, customers and vendors. Associates are expected to treat fellow associates, customers, vendors and any guests in the facilities with courtesy to resolve and differences in a professional, non-abusive, and non-threatening manner. Associates are responsible for their own behavior and for understanding how others may perceive their conduct in the workplace …

*Id*. at p. 4.

8. The Standards of Performance explains that there are two types of prohibited conduct: (i) Major Work Rule Violations, which "are those behaviors that are so serious in nature that they typically warrant immediate termination upon the first offense;" and (ii) Minor Work Rule Violations, which "are those behaviors that although not permitted, are generally addressed through the progressive disciplinary process." Id. at p. 1.

9. The Standards of Performance describes the four types of discipline applicable to Minor Work Rule Violations as follows: (i) Coaching; (ii) Counseling; (iii) Final Warning; and (iv) Termination, and explains that "Managers maintain the discretion to escalate the discipline progression (or skip steps), depending on the nature and severity of the issue." *Id*.

2

**b.  Home Depot's Harassment and Non-Discrimination Policy**

10.     Home Depot's Harassment and Non-Discrimination Policy in effect during plaintiff's employment, on which plaintiff admits she was repeatedly trained, provides that:

> Home Depot is committed to ensuring that associates work in an environment of mutual respect that is free of harassment and discrimination. Home Depot prohibits discrimination or harassment on the basis of race, religion, creed, color, national origin, ancestry, citizenship status, disability …, medical condition, … or any other basis prohibited under applicable law in employment decisions regarding hiring, training, pay, promotion, job assignments, discipline, or any other terms and conditions of employment. … Any manager, supervisor, and/or associate will be disciplined appropriately, up to and including termination (in accordance with the No Retaliation SOP and the Home Depot Standards of Performance and discipline policies), if he/she violates the non-discrimination or harassment policy.

*See* Plaintiff Dep. at p. 124, l. 5 – p. 125, l. 2, attached to the Brady Decl. as Exhibit 1.  *See* also Home Depot's Harassment and Non-Discrimination Policy, dated January 2020, at p. 1, attached to the Brady Decl. as Exhibit 3.

11.     Home Depot's Harassment and Non-Discrimination Policy further provides that Home Depot "does not discriminate against individuals with disabilities" and explains that any associate with a disability can begin or continue employment as long as the associate: (i) can perform the essential functions of the job, either with or without reasonable accommodation; and (ii) poses no serious health risk to others or themselves."  *See* Home Depot's January 2020 Harassment and Non-Discrimination Policy, at p. 2, attached to the Brady Decl. as Exhibit 3.

12.     The Harassment and Non-Discrimination Policy informs associates that Home Depot "cannot address a problem if it does not know that a problem exists," stresses the importance that "associates promptly come forward to report any discriminatory, harassing, and/or disrespectful behavior," and delineates a variety of avenues available for associates to voice

3

workplace concerns including the availability of a 1-800 Aware Line to report harassment or discrimination. *Id.* at p. 4.

**c. Home Depot's Reasonable Accommodation Policy**

13. Home Depot's Reasonable Accommodations policy, in effect during plaintiff's employment with Home Depot, provides that:

> A qualified individual with a disability may request a reasonable accommodation at any time during the application process or during employment. … An individual with a disability can request reasonable accommodation when she/he knows that there is a workplace barrier that is preventing him/her, due to the disability, from performing the job effectively, …

*See* Reasonable Accommodation Policy dated May 2018, at p. 1, attached to the Brady Decl. as Exhibit 4.

14. The policy explains that when an associate requests an accommodation, a member of management will use the Interactive Process Checklist and discuss with the associate the specific job-related limitation imposed by the disability and the manner in which it may be overcome and refer the matter to Home Depot's Medical Health Management Department to evaluate the request and review the supporting medical documentation from the associate's healthcare provider. *Id.*

**d. Home Depot's Leave of Absence Policy**

15. Home Depot offers associates various types of leaves of absence, including family leave and medical leave, because it "realizes that associates may be faced with conditions beyond their control, such as medical, family, or personal situations that require time off from work." *See* Home Depot's Leave of Absence Policy dated November 2018, at p. 6, attached to the Brady Decl. as Exhibit 5.

FIRM:70629422v1

16. With respect to medical leaves, the policy explains that "An associate is eligible for medical leave when he/she is under the care of a qualified health care provider and unable to work for more than three consecutive days due to his /her own serious health condition" and that "medical documentation must be provided to support the leave." *Id* at p. 30.

17. The associate must submit a Certificate of Health Care Provider form completed by his/her medical care provider "within 15 calendar days of the receipt of the request for certification from Home Depot. *Id*. at p. 32.

18. The policy explains that "Associates who need to extend their medical leave beyond the original date stated within their Certification or Health Care Provider documentation may do so at any time from the start of their leave through their return to work date" and that, to do so, "the associate must submit documentation from a health care provider to support the additional time that he/she will be out on LOA (subject to the maximum period discussed above [in the policy]). *Id* at p. 34.

19. Requests for extension of medical leaves beyond one-year must be approved by the Regional Human Resources Director ("RHRD"). *Id*. at p. 31 (emphasis added). The policy further explains that:

> If an associate contacts the Company **prior to the associate's leave expiration** and requests a reasonable accommodation, the request will be reviewed by Medical and Health Management (MHM) **to determine if there is a reasonable accommodation that will enable the associate to perform the essential functions of the job**. If the associate can return to work with a reasonable accommodation, the associate should contact his/her Manager or MHM to engage in an interactive process.

*Id*. at p. 31 (emphasis added).

FIRM:70629422v1

### e. **Home Depot's COVID-19 Category 3b Leave of Absence**

20. During the Coronavirus pandemic, Home Depot implemented temporary time off policies in alignment with government agencies and the Center for Disease Control's interim guidance, providing for three (3) types of leaves for employees impacted by the Coronavirus. *See* Home Depot's COVID-19 (Coronavirus) Temporary Policy, attached to the Brady Decl. as Exhibit 6.

21. A Category 1 Leave was created for associates who tested positive for COVID-19. *Id.* These associates were directed not to report to work until released to return to work by their physician. *Id.*

22. A Category 2 Leave was created for associates who: (i) returned from a "widespread, sustained transmission" area or from a cruise that had a confirmed case of COVID-19 within the prior fourteen (14) day period. *Id.* These associates were directed to stay home for fourteen (14) days following their return home before reporting to work. *Id.*

23. Of pertinence to the present case, a Category 3 Leave was created for associates who have been indirectly impacted by COVID-19, and who do not meet the criteria for Category 1 or 2, such as associates impacted by school closings or who had a generalized fear of exposure. *Id.* These Associates were permitted to "take excused unpaid time off to accommodate their individual situation." *Id. See also* Deposition of Eneka David dated July 30, 2025 ("David Dep.") at p. 144, l. 20-21, attached to the Brady Decl. as Exhibit 7 ("Category 3B was something created for COVID").

24. On December 21, 2021, Home Depot retired the Category 3 COVID-19 leave. *See* COVID-19 Category 3b LOA Transition Leader Guide, attached to the Brady Decl. as Exhibit 8. As a result, employees on a Category 3b leave were required to return to work by March 7, 2022, or "use other time off available to them under standard company time off policy." *Id.*

6

## II. Plaintiff's Employment With Home Depot

25.     Plaintiff commenced employment with Home Depot on or about January 6, 2017, as a part-time Sales Associate in the Garden Department of a Home Depot store in Austin, Texas. *See* Plaintiff Dep. at p. 112, l. 21- p. 113, l. 4, attached to the Brady Decl. as Exhibit 1.

26.     Plaintiff worked as a part-time Sales Associate in the Garden Department of the Austin, Texas store for approximately ten (10) months, from in or about January 2017, to November 10, 2017, when she moved to Oklahoma and transferred to a Home Depot store located in Tulsa, Oklahoma. *Id*. at p. 125, l. 19-22, p. 127, l. 9-19, and p. 127, l. 20 – p. 128, l. 7.

27.     Plaintiff worked at the Tulsa, Oklahoma store for approximately a year and a half, from on or about November 10, 2017, to on or about April 1, 2019, initially as a part-time Garden Department Associate (from November 10, 2017, to January 14, 2018), and subsequently as an overnight Freight Team Associate (from January 15, 2018, to April 1, 2019).  *Id*. at p. 127, l. 20 - p. 128, l. 7, p. 131, l. 4-17, and p. 132, l. 24 – p. 133, l. 8.

28.     Plaintiff asserts no claims arising from her employment with Home Depot at either the Austin, Texas store, or the Tulsa, Oklahoma store.  *Id*. at p. 128, l. 8-12, p. 134, l. 20-23, and p. 154:25- p. 155, l. 6.

29.     On or about April 1, 2019, plaintiff moved to New York from Oklahoma because she "wanted to work construction in New York," and transferred as an overnight Freight Associate to Home Depot Store No. 6152 located in Brooklyn, New York (the "Starrett City store").  *Id*. at p. 133, l. 9-19 and p. 134, l. 14 – p. 135, l.20.

30.     After moving to New York on or about April 1, 2019, plaintiff worked as an overnight Freight Associate at the Starrett City store for two (2) years until May 2021, when she informed her Assistant Store Manager that she was not feeling well, believed she contracted the coronavirus (even though she never took a COVID test), and commenced a Category 3 COVID-

related leave of absence from Home Depot. *Id*. at p. 133, l. 9-19, p. 134, l. 14-19, p. 408, l. 20-25, and p. 410, l. 7-25.

31. Plaintiff never returned to work at Home Depot from her COVID-related leave of absence she commenced in May 2021:

> Q. Did you ever return to work at Home Depot after making that [May 2021] call?
> A. No, sir.

*Id*. at p. 410, l. 23-25.

32. After repeatedly granting plaintiff's requests and extending plaintiff's return to work date for more than two years, Home Depot ultimately terminated plaintiff's employment on June 1, 2023, because plaintiff remained unable to return to work. Plaintiff was eligible for rehire. *See infra* at ¶¶ 187 to 226.

## III.     The Freight Associate Position

33. Freight Associates work the overnight shift and are responsible for stocking merchandise onto shelves for customer availability. *See* Freight Team Associate Job Description, attached to the Brady Decl. as Exhibit 9.

34. Among their job duties, Freight Team Associates: (i) move freight safely from designated staging areas to the sales floor; (ii) sort the merchandise on the sales floor and stock it on the shelves for customer availability; and (iii) and follow proper safety and back injury prevention guidelines in fulfilling these tasks. *Id*.

35. It is a physically challenging job that involves "bending, stooping, reaching, twisting, lifting, pushing, pulling and moving merchandise" and "climbing ladders up to the height of 12-16 feet to obtain or stock merchandise." *Id*.

8

36. The overnight freight team works from 9:30 p.m. to 5:30 a.m., on Sundays through Thursdays. *See* Plaintiff Dep. at p. 137, l. 20 – p. 138, l. 2 and p. 144, l. 8-10, attached to the Brady Decl. as Exhibit 1.

37. The Starrett City store closed at 10:00 p.m. *Id.* at p. 143, l. 17-24. As such, but for the beginning of their shift, the Starrett City store was closed to customers while the overnight freight team worked stocking merchandise. *Id.*

38. According to plaintiff, there were "more than 15, less than 25" overnight Freight Team Associates working at the Starrett City store when plaintiff worked there, 6 of whom were female. *Id.* at p. 143, l. 5-10 and p. 145, l. 13-18.

39. The overnight Freight Team was supervised by an overnight Assistant Store Manager. *Id.* at p. 141, l. 5-8.

40. For the first two years that plaintiff worked in the Starrett City store (April 2019, to March 2021), Assistant Store Manager David Leslie was the overnight manager who worked with and supervised the overnight Freight Associates. *Id.*

41. After Mr. Leslie left Home Depot in March 2021, four (4) other Assistant Store Managers (Wendell Cunningham, Ricky Campbell, Joseph Bazile and Kerry (LNU)) took turns working with and supervising the overnight shift on a rotating basis. *Id.* at p. 141, l. 9 – p. 143, l. 4.

42. While the overnight Freight Team was responsible for stocking the entire store, members of the team were assigned specific responsibility for a particular department in the store. *Id.* at p 52, l. 22 – p. 53, l. 4. and p. 148, l. 22 – p. 149, l. 5.

43. Plaintiff and a fellow Freight Team Associate named David were responsible for stocking the Electrical Department. *Id.* at p. 51, l. 15 – p. 53, l. 25 and p. 148, l. 22- p. 149, l. 19.

FIRM:70629422v1

44.     Freight Team Associates take a 30-minute meal break each shift. *Id*. at p. 150, l. 24 – p. 151, l. 3.

45.     The members of the overnight Freight Team did not take their breaks at the same time. *Id*. at p. 150, l. 19 – p. 151, l. 7 and p. 151, l. 20 – 25. Rather, each associate -- including plaintiff -- had the discretion to take his or her 30-minute break whenever he or she wanted. *Id*. Plaintiff generally chose to take her break at 3:00 a.m. *Id*. at 152:8-13.

## IV.     Plaintiff's Interaction with Co-Worker Anthony Gumbs

57.     Anthony Gumbs also worked as a Freight Associate at the Starrett City store. *Id*. at p. 149, l. 20 – p. 150, l. 18 and 153: 6-11.[3]

58.     Plaintiff did not know Mr. Gumbs before she transferred to the Starrett City store. *Id*. at p. 149, l. 20-23.

59.     Mr. Gumbs was assigned responsibility for stocking merchandise in the Flooring Department. *Id*. at p. 150, l. 14-18.

60.     Plaintiff raises issue with a series of alleged interactions with Mr. Gumbs in the eight-to-nine month period between late 2019, and July 1, 2020, while they worked in the Starrett City store:

### a.     Late 2019

61.     At some point in 2019, plaintiff heard someone say "Psst" while she was on a ladder packing out lightbulbs and, when she turned around, she saw Mr. Gumbs "winking and tooting his lips, raising his eyebrows." *Id*. at p. 160, l. 13- p. 161, l. 22.

---

[3] As noted, plaintiff has not served Mr. Gumbs with the Summons and Complaint in this matter.

62.     Mr. Gumbs did not say anything to plaintiff when she turned around, and she stepped off the ladder and walked away without saying anything to Mr. Gumbs.  *Id*. at p. 161, l. 23 – p. 162, l. 5.

63.     Plaintiff did not complain or otherwise notify a manager about this incident.  *Id*. at p. 162, l. 14-17.

### b.  Winter 2019

64.     On another occasion during the winter of 2019, plaintiff claims that Mr. Gumbs winked at her and blew a kiss as they passed each other walking in opposite directions in a store aisle.  *Id*. at p. 155, l. 7 – p. 156, l. 17.

65.     Plaintiff told Mr. Gumbs: "Not interested," and continued walking.  *Id*. at p. 157, l. 8 – p, 158, l. 6.

66.     Plaintiff did not complain or otherwise notify a manager about this incident. *Id*. at p. 158, l. 7-10.

### c.  Winter 2019/2020

67.     Sometime thereafter, on a date which she is not certain, Plaintiff passed Mr. Gumbs as she was leaving the breakroom "and he was standing there and he had the phone in his hand and put it in my face to look at it."  *Id*. at p. 162, l. 18 – p. 164, l. 19.

68.     Plaintiff looked at the phone for "three seconds" and saw a video of a man and woman "having rough sex."  *Id*. at p. 164, l. 24 – p. 165, l.8.

69.     Mr. Gumbs grinned but did not say anything.  *Id*. at p. 164, l. 20-23.

70.     Plaintiff told Mr. Gumbs that she did not know him like that, that she was not interested, asked him to leave her alone, and walked away from him.  *Id*. at p. 166, l. 3-12.

71.     Plaintiff testified during her deposition that she did not recall if she complained to any manager about this incident.  *Id*. at 168, l. 14-18.

FIRM:70629422v1

72.     Plaintiff can offer no specifics about any conversation with ASM Leslie about this incident:

> Q.     When did you go to him to complain, was it the same day, a week later?
> A.     I don't think it was the same day.
> Q.     Okay. Do you recall how much time had passed when you went to him to complain about it?
> A.     No.

*See* Plaintiff Dep. at p. 169, l. 17 – p. 170, l. 25, attached to the Brady Decl. as Exhibit 1.[4]

73.     Plaintiff admitted that she does not have a specific recollection of such a conversation with ASM Leslie about this alleged video incident referenced in her Interrogatory response:

> Q.     Did you ever go to Mr. Leslie to complain about Mr. Gumbs showing you that video?
> A.     Yes. I spoke to him about the video.
> Q.     **Okay. Do you have a specific recollection of the conversation where you did that?**
> A.     **No.**

*Id*. at p. 173, l. 11-19 (emphasis added).

### d. A "Couple Months Later" In Early 2020

74.     A "couple of months" later, after plaintiff had taken a nap in a recliner in the break room during her break, plaintiff asserts that Mr. Gumbs stopped her as she was leaving the break room, mumbled something she did not understand and showed her a photograph on his cell phone of her napping in the recliner. *Id*. at p. 175, l. 8 – p. 177, l. 10.

---

[4] According to Home Depot's records, the first time plaintiff complained about this incident was when she called Home Depot's 1-800 Awareline on July 1, 2020, and she admitted when questioned by Territory Associate Relations Manager Andrea Delvecchio that she did not contemporaneously complain or otherwise notify her manager about this incident when it occurred. *See infra* at Paragraph 118(a).

FIRM:70629422v1

75.    Plaintiff claims that Mr. Gumbs raised his eyebrows up and down and maybe a contorted kiss with his lips, prompting her to tell him to erase it and that she was not interested before she walked away.  *Id*. at p. 177, l. 11-24.

76.    Plaintiff testified that she "might" have complained to Assistant Store Manager David Leslie and that she "think[s]" she went to Mr. Leslie to complain about Mr. Gumbs taking her picture.  *Id*. at p. 178, l. 3-4 and l. 11-13.  Plaintiff is unable to state where this possible conversation with Assistant Store Manager Leslie took place.  *Id*. at p. 178, l. 14-17.[5]

**e.  April 24, 2020**

77.    On April 24, 2020, Mr. Gumbs entered the break room and sat down while plaintiff and co-worker Kevin Barry were there on break watching the Lucille Ball show.  *Id*. at p. 181, l. 11 – p. 183, l. 4.

78.    Mr. Gumbs asked them who was on the television, inquiring if it was Lucy.  *Id*. at p. 183, l. 5-19.

79.    Plaintiff responded that it was the Lucille Ball show, and asked him what happened to his vision and if he was diabetic.  *Id*. at p. 183, l. 20 – p. 184, l. 10.

80.    Plaintiff asserts that Mr. Gumbs responded by stating that "I was flying a kite.  I used to fly kites," and made what she perceived to be a masturbation movement with his right hand ("like a diagonal up and down movement").  *Id*. at p. 186, l. 16 – p. 187, l. 24.

81.    As plaintiff walked back to her cart in the Electrical Department, she "bumped into" Assistant Store Manager ("ASM") David Leslie in the Electrical Department aisle and told him what happened.  *Id*. at p. 188, l. 10-24.

---

[5] Home Depot's records indicate that, as with the incident with the video, plaintiff did not notify Home Depot of this concern until she called the Awareline on or about July 1, 2020, and that she admitted when interviewed by TARM Delvecchio that she did **not** notify any manager about this incident when it occurred.  *See infra* at Paragraph 128(a).

FIRM:70629422v1

82.     ASM Leslie spoke with and obtained written statements from plaintiff, Mr. Gumbs and Kevin Barry, a co-worker who Plaintiff advised was present in the breakroom. *Id*. at p. 192, l. 20-22, p. 193, l. 12-14, and p. 194, l. 23 – p. 195, l. 8. *See also* Plaintiff's April 25, 2020 Associate Statement attached to the Brady Decl. as Exhibit 10.

83.     Mr. Gumbs explained to Mr. Leslie that when plaintiff asked about his eyesight, he tried to explain to her that that his eyesight was poor because his eyes were "badly burned from the sun" when he looked up into the sun while flying kites growing up in the Caribbean. *See* June 25, 2025 Deposition of Andrea Delvecchio ("Delvecchio Dep.") at p. 109, l. 7 – p. 110, l. 6, attached to the Brady Decl. as Exhibit 11.[6]

84.     ASM Leslie and SM Huertas spoke again with Mr. Gumbs about Plaintiff's complaint that he made a masturbation gesture with his hand, and Mr. Gumbs reiterated that when Plaintiff asked him about his eyesight, he attempted to communicate that he damaged his eyes looking into the sun as a child in the Caribbean, and made a hand gesture to replicate flying a kite as a child. *Id*. at p. 109, l. 11 p 110, l. 11.

85.     After speaking with Mr. Gumbs again and reviewing his explanation, ASM Leslie found Mr. Gumb's explanation "to be reasonable," concluded that there was a miscommunication between Plaintiff and Mr. Gumbs, and determined that no further action was necessary to address the situation. *Id*. at p. 109, l. 24 – p. 110, l. 11.

86.     Other than advising ASM Leslie what had happened when she "bumped into" him in the Electrical Department later that shift, Plaintiff did not complain to her Store Manager, Store Co-Manager, or Human Resource Manager about her April 24, 2020 interaction with Mr. Gumbs

---

[6] Plaintiff testified that she "hardly ever understood what [Mr. Gumbs] said" because he is from Trinidad and speaks with an accent. *See* Plaintiff Dep. at p. 244, l. 10-19, attached to the Brady Decl. as Exhibit 1.

FIRM:70629422v1

in the breakroom or about how ASM Leslie handled the matter.  *See* Plaintiff Dep. at p. 188, l. 10-24 and p. 201, l. 17 – p. 202, l. 7, attached to the Brady Decl. as Exhibit 1.

87.	Nor did plaintiff call Home Depot's 1-800 Awareline to complain about the April 24, 2020 interaction with Mr. Gumbs or Mr. Leslie's handling of the matter:

> Q.	How about did you ever call the 1-800 Awareline after that incident to complain why is he still here?
> A.	No.
> Q.	Why not?
> A.	I didn't think to do it.

*Id*. at p. 202, l. 8-14.

### f.	**Several Months Later In Summer 2020**

88.	Several months later, while working in the store sometime in the Summer of 2020, plaintiff alleges that Mr. Gumbs threw a surge protector at her.  *Id*. at p. 203, l. 9 – p. 204, l. 22.

89.	At the time, plaintiff was about 6 feet up a ladder in the Electrical Department packing out light bulbs.  *Id*.

90.	There were pallets containing merchandise on the floor next to the ladder from which plaintiff was working.  *Id*. at p. 204, l. 23 – p. 205, l. 6.

91.	According to plaintiff, Mr. Gumbs was standing about ten feet away from her on the other side of the pallets.  *Id*. at p. 206, l. 18 – p. 207, l. 7.

92.	Plaintiff did not see Mr. Gumbs throw the surge protector and is admittedly unable to state how it was tossed (underhand or overhand).  *Id*. at p. 209, l. 6-11.

93.	The surge protector that plaintiff claims Mr. Gumbs threw at her did not hit her.  *Id*. at p. 209, l. 16-17.

94.	Rather, the surge protector landed on one of the pallets placed between she and Mr. Gumbs, and rolled to the floor.  *Id*. at p. 209, l. 18 – 20.

FIRM:70629422v1

95.     Plaintiff testified that, after this incident, she "probably" told ASM Leslie that: "Your boy is at it again. He threw a surge protector at me." *Id*. at p. 213, l. 5-9. However, plaintiff conceded that she does not have a specific recollection of any such conversation. *Id*. at p. 213, l. 14-16.

96.     Nor did plaintiff utilize the 1-800 Awareline to report this incident to Home Depot. *Id*. at p. 215, l. 21-25.

### g.  July 1, 2020

97.     On July 1, 2020, plaintiff was "collecting cans and bottles" from the recyclable bin in the store break room which she did "almost every night" because she exchanged them for money. *Id*. at p. 220, l. 13 – p. 222, l. 8.

98.     There was a plastic garbage can and a plastic recyclable can next to each other in the breakroom. *Id*. at p. 222, l. 22 – p. 223, l. 15.

99.     Plaintiff took the lid off the recycling can and placed it on top of the garbage can while she retrieved cans and bottles from the recycling can. *Id*. at 223, l. 16-22.

100.    Plaintiff filled a bag with recyclables and left the break room to put the bag of recyclables in a shopping cart she had outside. *Id*. at p. 224, l. 12-20.

101.    Before leaving the breakroom, plaintiff did not return the recyclable lid to the top of the recyclable can, but left it on top of the garbage can. *Id*. at p. 228, l. 9-11.

102.    Plaintiff returned to the breakroom to collect more recyclables from the recyclable can which did not have a lid on it (because she had removed it and placed it on top of the garbage can). *Id*. at p. 228, l. 13-19.

103.    When she returned to the breakroom and was walking towards the recyclable can to collect more recyclables, she saw Mr. Gumbs walking towards the garbage can with a plate in

FIRM:70629422v1

his hand and understood that he was going to throw away his garbage. *Id*. at p. 225, l. 25 – p. 226, l. 23.

104. Plaintiff claims that she and Mr. Gumbs reached the location of the garbage can and recyclable can at the same time and both reached for the lid to the recycling can (that was then on top of the garbage can where plaintiff put it). *Id*. at p. 224, l. 22-24.

105. Plaintiff described what transpired after they both simultaneously grabbed the lid to the recyclable can as follows: "He put his plate on top of one of the garbage cans and grabbed the lid, **so I got the lid at the same time** and then he wants to play tug of war." *Id*. at p. 227, l. 13-17.

106. According to plaintiff, after they both grabbed the lid to the recyclable can, they each tugged on it for a few seconds before she let go of it and Mr. Gumbs raised it over his head and hit her with it on her shoulder. *Id*. at p. 231, l. 3- 21.

107. After plaintiff informed ASM Leslie about this incident, he asked her to complete an Associate Statement describing what transpired, which plaintiff did. *Id*. at p. 238, l. 16 – p. 240, l. 25.

108. When plaintiff sought to leave the store after this incident, ASM Leslie asked her to finish her shift and told her that he would escort Mr. Gumbs from the building, which he did. *Id*. at p. 253, l. 25 – p. 254, l 11, attached to the Brady Decl. as Exhibit 1.

109. When plaintiff returned home from her shift that morning, she called Home Depot's 1-800 Awareline to report the incident to Human Resources. *Id*. at p. 260, l. 14 – p. 261, l. 7.

### V. <u>Home Depot's Response</u>

110. Home Depot immediately arranged for plaintiff to work the day shift so that she would have no further contact with Mr. Gumbs while it investigated her concerns. *Id*. at p. 264, l. 4 – p. 265, l. 9.

17

111. Plaintiff had no contact with Mr. Gumbs while she worked the day shift pending Home Depot's investigation. *Id*. at p. 266, l. 4-16.

112. The investigation was conducted by Territory Associate Relations Manager ("TARM") Andrea Delvecchio. *See* Delvecchio Dep. at p. 68, l. 25 – p. 69, l. 8, attached to the Brady Decl. as Exhibit 11. *See also* Salesforce Case No. 00607450, marked as Exhibit H during Ms. Delvecchio's deposition, and attached to the Brady Decl. as Exhibit 12.

113. During the investigatory interview, plaintiff informed TARM Delvecchio of the following concerns:

a. Mr. Gumbs took her picture while she was sleeping on a recliner in the breakroom and showed her a video of a couple having sex. *See* Delvecchio Dep. at p. 92, l. 13 – p. 93, l. 13, attached to the Brady Decl. as Exhibit 11. Plaintiff told TARM Delvecchio that these incidents occurred "some months back" (*id*. at p. 92, l. 19-22), that there were no witnesses, and admitted that she did not previously report them. *Id*. at p. 94, l. 14-22;

b. Mr. Gumbs made the alleged masturbation gesture on April 25, 2020, that a coworker named Kevin was present, and that ASM Leslie investigated it. *Id.* at p. 107, l. 15- p. 108, l. 11;

c. Mr. Gumbs allegedly threw a surge protector at her on June 8, 2020 (even though she admittedly did not see him throw it and it did not hit her). *Id*. at p. 141, l. 20 – p. 142, l. 13; and p. 209, l. 6-17; an

d. Mr. Gumbs hit her on the back with the lid to the recyclable bin on July 1, 2020. *Id.* at p. 148, l. 21 – p. 149, l. 10.

114. After meeting with plaintiff, TARM Delvecchio questioned Mr. Gumbs about each alleged incident. *Id*. at p, 94, l. 23 – p. 95, l. 4 and p. 146, l. 10-16. *See also* Salesforce Case No.

FIRM:70629422v1

00607450, marked as Exhibit H during Ms. Delvecchio's deposition, and attached to the Brady Decl. as Exhibit 12.

115. As part of her investigation, TARM Delvecchio also interviewed ASM Leslie concerning his knowledge of each incident identified by Plaintiff. *Id*. at p. 108, l. 14 – p. 109, l. 10 and p. 146, l. 10-16. *See also* Salesforce Case No. 00607450, marked as Exhibit H during Ms. Delvecchio's deposition, and attached to the Brady Decl. as Exhibit 12.

116. TARM Delvecchio was unable to substantiate Plaintiff's complaints that Mr. Gumbs took her photo or showed her a video because Mr. Gumbs denied taking plaintiff's photo or showing her the video, and Plaintiff admitted that there were no witnesses to either incident. *Id*. at p. 94, l. 23 – p. 95, l. 4 and p. 105, l. 21 – p. 106, l. 2.

117. With respect to the hand gesture, TARM Delvecchio concluded that she could not "substantiate one way or the other whether Anthony Gumbs' explanation of what he was doing and the motion he was making referring to kites contrary to what [Plaintiff] felt as something inappropriate." *Id*. at p. 110. l. 20 – p. 111, l. 3.

118. With respect to the surge protector incident, TARM Delvecchio could not substantiate Plaintiff's assertion that Mr. Gumbs threw the surge protector at her given Plaintiff's admission that the surge protector did not hit her, but landed on the pallet behind her and rolled to the floor, which was consistent with Mr. Gumbs' claim that he tossed the surge protector onto the pallet in the Electrical Department. *Id*. at p. 144, l. 12-21.

119. With respect to the July 1, 2020 incident, TARM Delvecchio partnered with Melissa Greenlee from Home Depot's Workplace Violence Team, who investigated Plaintiff's complaint that Mr. Gumbs hit her with the recyclable can lid and reported her conclusion to TARM Delvecchio. *Id*. at p. 151, l. 7-21 and p. 154, l. 4-9. *See also* July 17, 2025 Deposition of Melissa

FIRM:70629422v1

Greenlee ("Greenlee Dep.") at p. 37, l. 10-12 and p. 38, l. 11-23, attached to the Brady Decl. as Exhibit 13.

120. Ms. Greenlee concluded that she could not substantiate Plaintiff's complaint about the July 1, 2020 incident because "it was a he-said-she-said situation" as "he said one thing, she said one thing, and there wasn't anything to back up what either person was saying." *See* Greenlee Dep. at p 47, l. 14-21 and p. 56, l. 10-12, attached to the Brady Decl. as Exhibit 13.

121. Ms. Greenlee reported her conclusion to TARM Delvecchio that plaintiff's claim that Mr. Gumbs hit her with the lid to the recyclable was unsubstantiated. *See* Delvecchio Dep. at p. 154, l. 4-9, p. 155, l. 15-19, and p. 156, l. 4-7, attached to the Brady Decl. as Exhibit 11 ("The results were inconclusive, as both Anthony [Gumbs] and Karriemah [Muqeet] denied their actions and there were no eyewitnesses present").

122. While Plaintiff's assertions were not substantiated, at the close of the investigation, TARM Delvecchio recommended that Mr. Gumbs be issued a Final Warning Discipline Notice and transferred to a different store based on the "pattern of behavior" between he and Plaintiff. *Id*. at p. 160, l. 16 – p. 161, l. 24 (emphasis added).

123. In addition, TARM Delvecchio recommended that District Human Resource Manager Eneka David have a conversation with both SM Huertas and ASM Leslie to reinforce with them their responsibility to partner and take appropriate timely action with respect to investigations. *Id*. at p. 165, l. 10-14 and p. 191, l. 5-21. *See also See also* Salesforce Case No. 00607450, at p. 5-6, marked as Exhibit H during Ms. Delvecchio's deposition, and attached to the Brady Decl. as Exhibit 12.

124. At the close of TARM Delvecchio's investigation, District Human Resources Manager ("DHRM") Eneka David partnered with a DHRM from another district and coordinated

20

Mr. Gumbs' transfer to a different store in accordance with TARM Delvecchio's recommendation. *See* David Dep. at p. 89, l. 6-11, attached to the Brady Decl. as Exhibit 7.

125. Plaintiff testified that, after working the day shift for approximately one week, she was informed by an Assistant Store Manager that she could return to the overnight shift because Mr. Gumbs was no longer working at the Starrett City store. *See* Plaintiff Dep. at p. 278, l. 16 – p. 280, l. 6, attached to the Brady Decl. as Exhibit 1.

126. Plaintiff admittedly never again saw Mr. Gumbs after ASM Leslie escorted him from the building in the middle of their shift following their interaction with the recyclable lid on July 1, 2020. *Id*. at p. 254, l. 16-23.

127. DHRM David also confirmed that SM Huertas issued the Final Warning Discipline Notice to Mr. Gumbs. *See* David Dep. at p. 89, l. 15-16, attached to the Brady Decl. as Exhibit 7.

128. DHRM David also met with both SM Huertas and ASM Leslie as recommended by TARM Delvecchio to reinforce their need to take timely action and partner with Human Resources when appropriate. *Id*. at p. 91, l. 15- p. 92, l. 4.

## VI.  **Plaintiff's Complaint About Music Played During The Overnight Shift**

129. In late November/early December 2020, four to five months <u>after</u> Mr. Gumbs was transferred out of the Starrett City store, ASM Leslie informed the Freight Associates that they could no longer listen to music through earbuds while they worked during the overnight shift because an associate at another store was fatally injured in an accident when he was listening to music through earbuds and did not hear a warning about falling scaffolding. *See* Plaintiff Dep. at p. 307, l. 6 – p. 309, l. 15 and at p. 398, l. 7 – p. 399, l. 3, attached to the Brady Aff. as Exhibit 1.

130. Plaintiff claims that after ASM Leslie made this announcement, four coworkers on the overnight shift (Kern, Lance, Tysheen, and an associate who worked in the power tools aisle

FIRM:70629422v1

whose name she does not know) began playing music with sexually explicit lyrics over speakers while they worked. *Id*. at p. 309, l. 16 – p. 311, l. 12.

131.    On several occasions in late 2020 and early 2021, plaintiff asked a manager on duty on the overnight shift to ask an associate to stop playing music. *Id*. at p. 331, l. 3- p. 333, l. 2, p. 333, l. 15 – p. 335, l. 16, p. 338, l. 2 – p. 339, l. 22, and p. 339, l. 23 – p. 342, l. 10.

132.    On each of these occasions, the manager with whom plaintiff spoke directed the associate to turn the music off and the associate did. *Id*.

133.    However, plaintiff avers that the associate would turn the music back on after the manager left the work area. *Id*.

134.    At some point after she complained to the overnight managers about the music, Store Manager Huertas and Co-Manager Satish Williford called Plaintiff to the managers' office and asked her to tell them about the music. *Id*. at p. 361, l. 5-25. Plaintiff is unable to state specifically when this conversation occurred. *Id*. at p. 358, l. 10-14.

135.    Plaintiff advised Mr. Huertas that "the staff is playing Caribbean and hip-hop music that has sexually explicit language." *Id*. at p. 362, l. 6 – p. 364, l. 16.

136.    Mr. Huertas asked her who was playing the music, and she told him that Kern Girard, Tyshene Fahie, Lance Messiah, and the associate in power tools played the music. *Id*.

137.    Mr. Huertas told Plaintiff that he would speak with the associates she identified. *Id*. at p. 364, l. 20-22.

138.    Plaintiff admits that the managers spoke with the associates about the music as she overheard Co-Manager Satish Williford telling Kern Girard on two or three occasions to turn off the music to which he was listening. *Id*. at p. 403, l. 23 – p. 404, l 20.

FIRM:70629422v1

139. A few weeks after the meeting, Store Manager Huertas followed up with Plaintiff, asking her if her coworkers had stopped playing the music. *Id*. at p. 366, l. 10 – p. 367, l. 19.

140. Co-Manager Williford also followed-up with Plaintiff, inquiring if the associates had stopped playing the music. *Id*. at p. 365, l. 2-20.

141. Although she did not take a COVID test, by early May 2021, Plaintiff was experiencing "the signs and symptoms" of COVID, including "the fatigue, the loss of appetite, I lost my taste buds for about two years." *Id*. at p. 408, l. 16 – p. 409, l. 17 and p. 411, l. 1-13.

142. On May 23, 2021, Plaintiff commenced a COVID-related Category 3b leave of absence from Home Depot. *See supra* at ¶¶20-23.

143. On June 24, 2021, approximately one month after Plaintiff commenced her COVID-related Category 3b leave of absence, the New York City Commission on Human Rights ("NYCCHR") sent Home Depot a copy of a Complaint that Plaintiff had filed with the NYCCHR. *See* June 24, 2021 cover letter from the NYCCHR, attached to the Brady Decl. as Exhibit 14.

144. In her NYCCHR Complaint, Plaintiff complained, *inter alia*, about her coworkers playing music with sexually explicit lyrics on speakers while they work. *See* Plaintiff's NYCCHR Complaint at ¶¶26-27, attached to the Brady Decl. as Exhibit 15.

145. Upon receipt of Plaintiff's NYCCHR Complaint, Home Depot arranged for TARM Jason Brotea to investigate Plaintiff's allegations relating to music. *See* June 26, 2025 Deposition of Jason Brotea ("Brotea Dep." at p. 41, l. 1 – p. 42, l. 10, attached to the Brady Decl. as Exhibit 16. *See also* Salesforce Case Number 01807983, marked as Exhibit A during Mr. Brotea's deposition, attached to the Brady Decl. as Exhibit 17.

146. After completing his investigation, TARM Brotea concluded that "action was taken" by the management team in response to Plaintiff's complaints about the music, but found

that the approach to addressing the music situation was "inconsistent" "due to the lack of a permanent night ops manager" and the fact that "multiple leaders were assisting with covering the overnight shift." *Id*.

147. At the close of his investigation, TARM Brotea recommended to DHRM David that

> DHRM to verify Respect for all People training is loaded on the entire leadership team's learning curriculum as well as all night associates including the night MET Team. This includes both salaried leaders and supervisors. Once the training is completed, the leadership team should meet with all night associates and confirm the understanding is no music is permitted to be played on speakers in the workplace and the team can play music using headphones with one ear only

*Id*. at p. 5. *See also* Brotea Dep. at p. 60, l. 5-8, attached to the Brady Aff. as Exhibit 16.

148. DHRM David supported TARM Brotea's recommendation and ensured that all overnight associates and Store leaders complete the Respect training class in accordance with TARM Brotea's recommendation. *See* David Dep. at p. 123, l. 24 – p. 124, l. 9 and p. 125, l. 16-18, attached to the Brady Decl. as Exhibit 7.

149. In addition, DHRM David ensured that the management team at the Starrett City store uniformly understood that "no music is permitted to be played on speakers in the workplace, and the team could play music using one headphone with one ear only." *Id*. at p. 129, l. 23– p. 130, l. 4.

150. After TARM Brotea's investigation, SM Huertas and Co-Manager Satish Williford spoke individually with each associate working the overnight shift to communicate "the standard going forward," that "music should not be played at night" and "if they're gonna play music, it needs to be on one ear pod." *See* June 27, 2025 Deposition of Jason Huertas ("Huertas Dep.") at p. 85, l. 19 – p. 86, l. 15 and p. 89, l. 2-7, attached to the Brady Decl. as Exhibit 18.

FIRM:70629422v1

## VII. Plaintiff's COVID Related Cat3b Leave of Absence

### a. Plaintiff Puts Herself Out On A COVID-Related Category 3b LOA

151. In May 2021, Plaintiff sought treatment from Dr. Alford Smith, then her health care provider for residual complications from COVID, including "chronic fatigue," "severe weakness," "short term memory loss," and an inability "to walk one block without exhaustion and muscle ache" following a bout with COVID in May 2021. *See* Deposition of Dr. Alford Smith dated April 22, 2026 ("Smith Dep.") at p. 31, l. 9-18 and p. 63, l. 2-7, attached to the Brady Decl. as Exhibit 19.

152. Dr. Smith assessed Plaintiff as suffering from COVID fatigue syndrome from which he opined she "wasn't going to recover anytime soon." *Id*. at p. 71, l. 13 - p. 72, l. 1 and p. 78, l. 14-20.

153. As noted (*supra* at ¶¶20-23), on May 23, 2021, Plaintiff commenced a COVID-related Category 3b leave of absence from Home Depot due to these symptoms. *See* Plaintiff Dep. at p. 408, l. 16 – p. 409, l. 17 and p. 411, l. 1-13, attached to the Brady Decl. as Exhibit 1.

154. No approval was needed for an associate to commence a COVID-related Category 3b leave of absence. *See* Huertas Dep. at p. 96, l. 9-20, attached to the Brady Aff. as Exhibit 18.

155. Plaintiff put herself out on a Category 3b leave:

> Q. Did you inform anyone at Home Depot that … you had COVID?
> A. I am trying to remember who answered the phone when I called out. … It was one of the Assistant Store Managers.
> …
> Q. As if I'm on the phone with you from the point you get on the phone with the manager, can you tell me, to the best of your recollection, what you said and what the manager said?
> A. I told him I was not feeling well. I believe I contracted the coronavirus?
> Q. Okay. And did the manager responds?
> A. …He said come back when I feel better and wished me well.
> Q. Anything else said that you recall?

FIRM:70629422v1

A.    No that was it.

*See* Plaintiff Dep. at p. 409, l. 8 – p. 410, l. 22, attached to the Brady Dep. as Exhibit 1.

156.    Although she remained employed by Home Depot for more than two years until June 2023, Plaintiff never returned to work at Home Depot after placing herself on leave on May 23, 2021.  *Id*. at p. 410, l. 23-25.

**b.  Home Depot Grants Plaintiff's Request For A Medical Leave Upon The Expiration Of Her Category 3B Leave**

157.    On March 3, 2022, SM Huertas emailed Plaintiff confirming that "the COVID-19 3B leave will be discontinued as of March 7, 2022 and associates will be required to return to work."  *Id.* at p. 447, l. 22 – p. 448, l. 12.  *See also* March 3, 2022 email exchange between SM Huertas and Plaintiff, marked as Exhibit P13 during Plaintiff's deposition and attached to the Brady Decl. as Exhibit 20.

158.    By way of this email, SM Huertas informed Plaintiff that "other time off options" were available if she was still unable to return to work and asked Plaintiff to "update me … so we are able to move forward."  *See* March 3, 2022 email exchange between SM Huertas and Plaintiff, attached to the Brady Decl. as Exhibit 20.

159.    Plaintiff responded to Mr. Huertas that same day, advising that Nadia Muhammad, one of her best friends who was acting as Plaintiff's Health Care Proxy and Power of Attorney, was waiting for Mr. Huertas to contact her to discuss Plaintiff's return to work.  *Id.  See also* Plaintiff Dep. at p. 79, l. 13-15, attached to the Brady Decl. as Exhibit 1.

160.    Plaintiff was admittedly unable to return to work because of her health in March 2022:

Q.    Did you believe in March of 2022 you were capable of returning to work at Home Depot in any position?
A.    No.

FIRM:70629422v1

*See* Plaintiff Dep. at p. 462, l. 11-14, attached to the Brady Aff. as Exhibit 1.

161. Accordingly, Ms. Muhammad, on Plaintiff's behalf, advised SM Huertas that Ms. Muqeet could not return to work and needed a medical leave of absence. *Id*. at p. 460, l. 4 – p. 461, l. 22.

162. On April 5, 2021, Ms. Muhammad met with ASM Campbell to complete Home Depot's reasonable accommodation interactive process, at which time Ms. Muhammad asked that Plaintiff be granted a three-month medical leave of absence. *Id.* at p. 467, l. 7-16. *See also* April 5, 2026 Reasonable Accommodation Interactive Process Checklist, marked as Exhibit 17 during Plaintiff's deposition and attached to the Brady Decl. as Exhibit 21. *See also* May 15, 2026 Deposition of Nadia Muhammad ("Muhammad Dep.") at p. 70, l. 8 – p. 71, l. 23, attached to the Brady Decl. as Exhibit 22.

163. On May 10, 2022, Ms. Muhammad provided Home Depot with a certification from Dr. Smith requesting that, rather than returning to work on March 7, 2022, Plaintiff be granted an additional nine-month medical leave through December 31, 2022. *See* Muhammad Dep. at p. 82, l. 12 – p. 83, l. 8 and p. 86, l. 16 – p. 88, l. 9, attached to the Brady Decl. as Exhibit 22. *See also* Dr, Smith's May 9, 2022 Certification, marked as Exhibit P-18 during Plaintiff's deposition and attached to the Brady Decl. as Exhibit 23.

164. Based on Dr. Smith's May 9, 2022 Certification, Home Depot granted Plaintiff's request for a medical leave of absence through December 31, 2022. *Id*. at p. 74, l. 10-12.

c. **Plaintiff's Inability To Return To Work By December 31, 2022, And The Circumstances Leading To The Termination Of Plaintiff's Employment**

165. Plaintiff did not return to work on December 31, 2022. *See* Plaintiff Dep. at p. 477, l. 3-5, attached to the Brady Decl. as Exhibit 1.

FIRM:70629422v1

166. Dr. Smith, who treated Plaintiff once a month for nearly two years between June 30, 2021, to April 3, 2023, testified that he had no real expectation that Plaintiff would actually be able to return to work. *See* Smith Dep at p. 35, l. 5-14, p. 60, l. 18-24, p. 153, l. 6-11, and p. 184, l. 16-18, attached to the Brady Decl. as Exhibit 19.

167. Based on Plaintiff's reported symptoms of complications from COVID and his treatment of Plaintiff, Dr. Smith testified that, "based on the extended period of time without much progress," Plaintiff's prognosis was "very poor." *Id.* at p. 48, l. 16 – p. 49, l. 4.

168. Having been out of work for some nineteen (19) months (May 23, 2021 through December 31, 2022), Plaintiff admits that she was physically unable to return to work at Home Depot upon the expiration of this medical leave of absence on December 31, 2022:

> Q.　Did you return to work on December 31 of 2022?
> A.　No, sir.
> Q.　And why not?
> A.　I was not well, sir.
> Q.　Were you still unable to work on December 31, 2022?
> A.　I was not well enough to work, no, sir.

*See* Plaintiff Dep. at p. 480, l. 4-12, attached to the Brady Decl. as Exhibit 1.

169. When Plaintiff failed to return to work as scheduled on December 31, 2022, Home Depot Leave of Absence Case Specialist Elmore repeatedly contacted both Plaintiff and Ms. Muhammad, Plaintiff's medical proxy, to request an update on Plaintiff's status. *See* July 31, 2025 Deposition of Morgan Elmore ("Elmore Dep.") at p. 57, l. 15-20, attached to the Brady Decl. as Exhibit 24 ("I tried to get in contact with Nadia [Muhammad], tried to get in contact with Ms. Muqeet, couldn't get in contact with her. And then I kept calling leaving voice messages trying to get in contact, asking that we needed paperwork").

170. On May 2, 2023, Dr. Smith completed a Certification of Health Care Provider advising that Plaintiff was still unable to return to work and requesting that her leave be extended

FIRM:70629422v1

for an additional six (6) months, through November 2023. *See* May 2, 2023 Certification of Health Care Provider form completed by Dr. Smith and marked as Exhibit P23 during Plaintiff's deposition, attached to the Brady Decl. as Exhibit 25.

171. When he completed this form, Dr. Smith did not expect that Plaintiff would actually be capable of returning to work in November 2023, and that he selected the date "just like every other time" as a reference for him to reevaluate her at that time. *See* Smith Dep. at p. 187, l. 15 – p, 188, l. 10, attached to the Brady Decl. as Exhibit 19.

172. Dr. Smith testified that Plaintiff showed little improvement during the two years he treated her and that, by May 2023, she remained unable to work at Home Depot as a Freight Associate:

> Q. When she first came to you to seek treatment, in your opinion, was she able to do these types of physical job requirements?
> A. No. sir.
> Q. And how about when she last sought treatment with you in May of 2023, in your opinion was she capable of performing these types of physical job requirements?
> A. No.

*Id.* at p. 57, l. 25 – p. 58, l. 11.

173. Dr. Smith candidly acknowledged that by May 2023, after treating Plaintiff for two years, Plaintiff did not have a realistic chance of returning to work at Home Depot any time soon:

> Q. What was your opinion of her prognosis for recover?
> A. That it would take a long time, it would take years to recover.
> Q. Was it your opinion that she was not going to be able to work for years, at least in the type of work she was doing?
> A. That is correct.

*Id.* at p. 180, l. 25 – p. 181, l. 9.

174. Indeed, on March 27, 2023, nearly two-years after she put herself on the COVID-related Category 3b leave of absence, Plaintiff complained to Dr. Smith of exhaustion with

FIRM:70629422v1

minimal activity and a lack of energy impacting her ability to stay awake, and reported that she was sleeping 12 to 15 hours each day. *Id*. at p. 177, l. 4-14.

175. Dr. Smith testified that he believed Plaintiff "was totally and permanently disabled" due to the complications from COVID (*id*. at p. 50, l. 12-20), explaining that:

> I said the condition has been going on for over a year and it's our clinical impression when a patient has a condition that goes on for a year that it would be time for them to consider filing for total disability because we don't anticipate them to recover, even though it may take them maybe another year to recover, two years ...

*Id*. at p. 180, l. 7-17.

176. Plaintiff admits that she remained physically unable to return to work at Home Depot as of May 2023, after a two (2) year leave of absence:

> Q. Did you agree that as of May 2 of 2023 you were unable to perform any of your job functions due to your condition?
> A. Yes sir.

*See* Plaintiff Dep. at p, 492, l. 6-9, attached to the Brady Decl. as Exhibit 1.

177. At that time, approval from the Regional Human Resources Director ("RHRD") was needed to grant extensions to a medical leave beyond twelve-months. *Id.* at p. 142, l. 19-22.

178. At that time in May 2023, DHRM David communicated with the RHRD about Plaintiff's request to further extend her medical leave through November 2023. *See* David Dep. at p. 169, l. 4-14, attached to the Brady Dep. as Exhibit 7. Though DHRM David does not recall the specifics of her conversation with the RHRD, approval was not obtained from the RHRD to further extend Plaintiff's medical leave. *Id*.

179. Once the decision not to further extend the medical leave beyond the one-year period was made, Leave of Absence Case Specialist Morgan Elmore notified Plaintiff by letter dated June 2, 2023**,** advising that her request to further extend her medical leave was not approved

FIRM:70629422v1

and that her employment with Home Depot was being terminated effective June 1, 2023, due to her inability to return to work.  *See* Elmore Dep. at p. 78, l. 18 – p. 79, l. 3, attached to the Brady Decl. as Exhibit 24.  *See also* June 2, 2023 letter to Plaintiff from Morgan Elmore, attached to the Brady Decl. as Exhibit 26.[7]

180.    The letter advised that Plaintiff was eligible for rehire and could re-apply for employment to Home Depot in the future.  *See* June 2, 2023 letter to Plaintiff from Morgan Elmore, attached to the Brady Decl. as Exhibit 26.

181.    Plaintiff testified that she never reapplied for employment with Home Depot.  *See* Plaintiff Dep. at p. 522, l. 15 – p. 524, l. 15, attached to the Brady Decl. as Exhibit 1.

182.    Dr. Stephen Liverpool, who became Plaintiff's primary care provider after Dr. Alford Smith, treated Plaintiff for her continued complaints of chronic fatigue, generalized weakness, and short-term memory loss from July 21, 2023, through January 23, 2024.  *See* May 19, 2026 Deposition of Stephen Liverpool ("Liverpool Dep.") at p. 26, l.14-19 and p. 32, l. 7-18, attached to the Brady Aff. as Exhibit 27.

183.    When he last saw Plaintiff on January 23, 2024, Dr. Liverpool noted that Plaintiff was "improving slowly" from her long Covid symptoms, but "still had some improvement to do" before she could return to the type of work she performed when she left Home Depot nearly three years earlier in May 2021.  *Id.* at p. 79, l. 11-17, p. 93, l. 4-14, and p. 102, l. 4-10.

184.    Dr. Liverpool testified that he had no expected time frame for Plaintiff to be able to return to that type of work:

> Q.      Did you form an opinion with any reasonable certainty as to
>         when she would be able to return to the manual type of work
>         she told you she did?

---

[7] Plaintiff does not believe that she received the June 2, 2023 letter.  Instead, Plaintiff asserts that did not become aware that her employment with Home Depot had terminated until March 2024.  *See* Plaintiff Dep. at p. 501, l. 23 – p. 502, l. 4, attached to the Brady Decl. as Exhibit 1.

FIRM:70629422v1

A.  No, I did not have any time frame for her returning to full duty.

*Id*. at p. 102, l. 11-15.

185.  On January 26, 2024, Plaintiff called Home Depot to advise that she had paperwork from her doctor relating to her return to work.  *See* January 26, 2024 note on Salesforce Ticket No. 02641252, attached to the Brady Decl. as Exhibit 28.  When Human Resources confirmed that her employment had been terminated, Plaintiff advised that she was going to submit the paperwork from her doctor "for a possible term[ination] reversal."  *Id*.

186.  Plaintiff then submitted to Home Depot a January 23, 2024 letter from Dr. Liverpool which explained that Plaintiff could "return to part time sedentary activities only" and that any return to work was with the following restrictions: "no lifting, no pushing or pulling."  *See* Dr. Liverpool's January 23, 2024 letter, attached to the Brady Decl. as Exhibit 29.  *See also* Liverpool Dep. at p. 99, l. 4 – p. 100, l. 8, attached to the Brady Decl. as Exhibit 27.

187.  Dr. Liverpool explained that:

Q.  When you say sedentary activities, what is it you're referring to?
A.  Sedentary, that means she can do sitting, paperwork, that kind of stuff.

*See* Liverpool Dep. at p. 101, l. 22-24, attached to the Brady Decl. as Exhibit 27.

188.  On March 7, 2024, more than two months later, Plaintiff emailed to Home Depot medical documentation she purportedly obtained from Dr. Tsai Chai relating to her "return to work with limitations."  *See* Plaintiff's March 7, 2024 email to mythdhr@homedepot.com, set forth in Salesforce Ticket No. 02641252, attached to the Brady Decl. as Exhibit 30.  *See also* Dr. Chao's March 6, 2024 form, attached to the Brady Decl. as Exhibit 31.

FIRM:70629422v1

189.     The March 6, 2024 note, purportedly from Dr. Chao, indicated that Plaintiff "can only perform simple tasks" and "must avoid … lifting over five pounds." *See* Dr. Chao's March 6, 2024 form, attached to the Brady Decl. as Exhibit 31.[8]

190.     When she submitted this document to Home Depot, Plaintiff advised Home Depot that she did not agree with the indication on the form that she "can only perform simple tasks," and felt that it should have indicated that she needs "extra time and assistance." *See* Plaintiff's March 7, 2024 email to mythdhr@homedepot.com, set forth in Salesforce Ticket No. 02641252, attached to the Brady Decl. as Exhibit 30.  Plaintiff provided no medical documentation supporting her disagreement with her doctor's assessment. *Id*.

191.     Despite her personal disagreement with Dr. Chao's purported medical opinion that she could only perform simple tasks, Plaintiff does not dispute that she remained physically unable to return to her job as a Freight Associate at Home Depot by March 2024, nearly three (3) years after she last reported to work at Home Depot:

> Q.     Did you believe in March of 2024, you were able to return
> to Home Depot as a freight team associate?
> A.     No, not freight team.

*See* Plaintiff Dep. at p, 516, l. 6-10, attached to the Brady Decl. as Exhibit 1.

---

[8] Dr. Chao, who treated Plaintiff for knee pain, neck pain and shoulder pain between September 27, 2023, and March 6, 2024, denied that he authored or signed the March 6, 2024 note that Plaintiff submitted to Home Depot. *See* April 29, 2026 Deposition of Tsai Chao ("Chao Dep.") at p. 24, l. 15-18, p. 28, l. 16-19, p. 56, l. 18-21, and p. 81, l. 18 – p. 83, l. 22, attached to the Brady Decl. as Exhibit 32.  Dr. Chao testified that he never assessed whether Plaintiff could return to work, and never discussed this topic with Ms. Muqeet. *Id*. at p. 85, l. 13 – p. 86, l. 16.

FIRM:70629422v1

Respectfully submitted,

Dated:  June 22, 2026

*s/Patrick G. Brady*

Patrick G. Brady, Esq. (PB1114)
pbrady@ebglaw.com
**EPSTEIN BECKER & GREEN, P.C.**
875 Third Avenue
New York, New York  10022
(212) 351-4500

One Gateway Center
Newark, New Jersey  07102
Phone: (973) 642-1900
Fax: (973) 639-8556
Attorneys for Defendant
Home Depot U.S.A., Inc.

FIRM:70629422v1